Case No. 17-1129 Free Press, et al. Petitioners v. Federal Communications Commission, et al. Mr. Schwartzman for the petitioners, Mr. Carr for the respondents. Judge Bled, I'd like to reserve five minutes for rebuttal. Thank you, and may it please the Court. In the absence of any factual record, the decision to reinstate the UHF discount on reconsideration for what may be a period of many years at the least was arbitrary and capricious. On reconsideration in 2017, the FCC didn't dispute, much less disprove, the following short sentence in the Commission's 2016 decision. Quote, the UHF discount serves only to confer a factually unwarranted benefit on owners of UHF television stations that undermines the purpose of the national audience reach cap. Despite the failure to challenge that finding, the reconsideration decision reinstated a definition of audience measurement that was inaccurate. It reversed a decision that had made the definition of audience reach accurate. That's a paradigmatic instance of arbitrary and capricious decision-making. Can you go back to the beginning for us and start by addressing the standing issue that's been raised in this case? Yes, Your Honor. This circuit has held that viewers have standing to challenge changes in FCC ownership rules. The administrative record and the supplemental declaration establish that petitioners have alleged injury, and the injury they've alleged comes well within the definitions that this Court described in the Rwandy and NAACP cases of injury that's cognizable by this circuit. Go ahead. But, Mr. Schwarzman, typically we have, when we have an organization as a certain representational standing, we have declarations of members, their individual harm, and we don't have that here. Well, that's certainly the case in license renewal proceedings where individual viewers assert injury. But in a rulemaking proceeding where you have organizations that are devoted to the very purpose of promoting diversity in the media, I don't believe that it's necessary for individual viewers to assert their standing. The organizations can say that they act on behalf of their members and so do. And that's what the Declaration of Matthew Wood says. What's your best case for that? Isn't there a more general standing principle after Summers that when you're alleging organizational standing, under prong one of the test, you have to identify a member and then make the case for standing as to that member? I don't think you have to identify an individual member, especially when you have organizations that have been recognized and active in this area on behalf of their members for years and whose activity through case after case has demonstrated that their members are indeed injured by this. I don't think the formalism of just having one member say, this is me, this isn't like walking through the woods in an environmental situation. I agree with you to the extent of you say you have millions of members and many of them watch television. I'll give you that much, but there's nothing in the declarations addressing traceability and redressability as to any one member. Well, I agree not as to any one member, but certainly that was not problematic in the NAACP case or the Lurandy case. And the Matthew Wood Declaration said that there are members who regularly view television and are adversely affected by concentration control and broadcast ownership. I don't believe that the causation needs to go to an individual member. Because, after all, we're dealing here with a kind of injury. It's not quite like the aesthetic injury of walking through the woods. You're talking about a kind of loss of diversity of voices that isn't going to be reflected by one member's perception that, oh, this particular program would be better if there were more diversity. And the court has recognized that in many cases where it's afforded misunderstanding. The basic step one on associational standing from the mouth of the Supreme Court is to demonstrate that at least one member would have standing to sue in their own right. Now, if you're arguing that no individual member would have standing as to diffuse an injury, then you've just talked yourself right out of associational standing under Hunt. Well, I'm saying that all the members are, and they say they're acting on behalf of all those members. Well, how do we know all the members are? You haven't made any representation about a single member's interest in diversity or a single member's injury, a single member's concern about loss of diversity. You just haven't said that in the standing declaration. Well, I agree, Your Honor, that there's no such statement. But it certainly has not been required in these prior cases where, in the context of these ownership decisions, it was in the other case. If you read those opinions, you'll see them talking about the individuals and the allegations. Well, that certainly wasn't the case in the NAACP decision. There was no individual assertion of an individual personally claiming that kind of injury for this court to have found standing. But it was the case in Rainbow Cush where this issue came up and the plaintiff made the same sort of argument that we're pursuing, we're advocating on behalf of a rule that's designed to ensure diversity, and the court said you still have to show standing under normal standards on an individual plaintiff basis. Your Honor, both the Rainbow Cush cases, and there's two, involve license renewals where the court has wanted an individual viewer to demonstrate the kind of standing that you talk about. That's not a rulemaking. And in those instances, the injury was very diffuse. They were not asserting the kind of injury that was recognized in NAACP and Lurandy, which was a loss of diversity, which, as I said, is harder to measure in terms of one individual. But it was about whether the FCC should have fined a broadcaster rather than designated for hearing and whether the FCC should have enforced its EEO rules. That's very different than the kind of concrete injury that's being described here in NAACP. Why would the distinction between a narrowly focused license renewal and a broader rulemaking, an assessment of a broad agency rule matter for Article III standing purposes? For Article III standing, the listener's standing, going all the way back to the United Church of Christ, requires a viewer in the listening area of the station. So you need to particularize it to somebody who is viewing that station because the application for renewal of that station is at issue. In a rulemaking, it's the entire country. It's much more general. And that's why I think the Court has recognized that you don't need to have that level of individual injury in order to be able to allege standing with respect to loss of diversity. What case have we said an association can have standing without demonstrating an individual injury in a rulemaking case? What case said that? Post-Sommers. Because I think Lurandy and NAACP are pre-Sommers. That's correct, Your Honor. They are pre-Sommers. But I do think that the holding there, which relates to these many members, The holding where? Are you talking about Sommers? NAACP.  You wouldn't have any objection to supplementing the record with declarations of individual members? Absolutely not, Your Honor. Just to close that loop, if we thought that was necessary. Absolutely not, Your Honor. We'd be happy to do that. And Judge Bork did that, for example, in a case called, had to do with Section 315. I'm sorry for that. But yes, that has been done where there's some question about linking up the standing. Do you, and when I say you, I mean all of the petitioners collectively. It's a number of organizations. Do you have members across the United States? Yes. Collectively? Yes, and that is alleged in the pleadings throughout the United States. Where is that alleged? I'm sorry, Your Honor. The declaration says activist members nationwide. But what I'm really wondering is, does that mean in every state? Yes, I'm confident that Common Cause has chapters in every state, for example. Well, does it have irritated listeners in every state? I think the loss of diversity is something that obviously has a national impact. So I think it does affect every state, the effect that it has on the market overall. Do you have any burden to make a case as to traceability and redressability? I understand your argument that the rule is designed to further those goals. But for standing purposes, don't you have to make some showing that whoever your listeners are, are in a market where it is likely that unless you prevail, diversity will be lessened? I don't think you need to show an individual market because one of the effects of a national footprint is that it changes the way in which local news is covered in all of those markets. But certainly the Prometheus Radio Project ex parte JA-269 describes the dramatic diminution of diversity that will harm the viewing public if the proposed decision is adopted. And JA-273 says, will rapidly usher in numerous transactions that will diminish diversity in the mass media and harm the public's first amendment right to have diverse sources of information. My yellow light is on, Your Honor, so I'd like to reserve the remainder of my time. I would like to ask you on the merits. Is there evidence that mergers or consolidations have happened in the wake of the reconsideration order? Well, it's obviously to some degree outside the record, Your Honor, but there have been applications including, I think the briefs do discuss the fact that Sinclair Broadcasting is attempting to acquire Tribune Broadcasting and there's another acquisition again outside of the record involving a company called Bonten. So yes, there have been and certainly we showed in the briefs and in the ex parte that was filed by Prometheus Radio Project that broadcasters are lined up as soon as this court clarifies what the situation is for the future and expect many billions of dollars in transactions to take place. Did any of those take place after the transition to digital transmission but before the repeal order in that window? Well, yeah. I mean there was substantial acquisitions as a result of the additional headroom that broadcasters got through the digital transition. For example, Fox went from 37.1% prior to the digital transition, the mere effect of the digital transition as the commission says in the 2016 decision. No, I got that. We reduced it to 24% and they used that headroom to acquire stations in San Francisco and Charlotte that they could not otherwise have done. All right. And then what is your answer to the argument that when Congress set 39% as the reach cap, it did that knowing there was this UHF discount in there? Well, first of all, I want to emphasize that whether the 39% cap and the UHF discount can be modified is a secondary point in our argument. The principal point I want to stress this morning is it was simply even if the FCC had authority to modify either of those, it was arbitrary and capricious to do it in the absence of any factual record. But if you look at the 2004 appropriations amendment, there were two additional parts of it besides the fact that it was silent on the UHF discount. It removed the national ownership cap from the originally biennial then quadrennial reviews and it also directed the FCC that it could not use its Section 10 forbearance procedures. That was clear indications that the intention was to lock in the 39%. But it was certainly acting with awareness that the FCC had said repeatedly that it was going to modify the UHF discount at the time of the digital transition and indeed the 2003 biennial review decision which predated the appropriations amendment. They partially repealed the UHF discount as to network owned stations. They sunset it as soon as the digital transition took place for them. So Congress was acting with an awareness that the FCC was intending to repeal the UHF discount and had actually partially repealed it going forward. So I think you need to look at that and the use of an administrative term that has a regulatory meaning, audience reach, certainly suggests an awareness of that factor. The UHF discount is just part of the way they calculate the cap. So taking as a given all of your very fair concerns about the UHF discount, why is it arbitrary and capricious for the agency to say we do want to look at that issue but we want to look at it in the context of a broader inquiry into the cap itself? Well, it's arbitrary and capricious. They certainly can conduct a rulemaking to do that, Your Honor. To do both? To do both. But in the interim, for what could be years, to reinstate something that admittedly the FCC does not dispute, has no legitimate factual underpinning, to put it back in is arbitrary and capricious. And as this Court is aware, just because the FCC starts a proceeding doesn't mean it finishes it. There are recent cases involving Stolls, MMTC a few months ago, and the prison phone case earlier this year. The FCC took eight, ten years to complete what seemingly could have been proceedings that could happen in a short period of time. And candidly, Your Honor, if this Court affirms, the FCC has almost no incentive to do anything with that rulemaking because broadcasters will have all the headroom they need for many years to come. So it's arbitrary and capricious to put the rule back in pending that linked consideration, if that's what the FCC wants to do. If we were one day before the repeal order, and the arguments are otherwise the same, and your clients say, look, whatever else is the case, you have to get rid of the UHF discount, and other people are saying, well, fine, think of that in the context of a broader inquiry, and the FCC had gone the route of opening a proceeding on the broader inquiry. That wouldn't be arbitrary and capricious. That's right, but in the 2016 decision, the FCC gave a very cogent explanation why the delay and the damage to diversity and localism that would take place while that longer inquiry proceeded made it inappropriate. After all, the digital transition took place in 2009, and the FCC didn't even get around to proposing a fix that it had said it was going to do 10 years earlier until 2013, and they didn't get around to finishing that until 2016. I think it was perfectly reasonable for the FCC to say we've got to stick a finger in the dike now, and we can think about other things later. Mr. Forsman, on your theory that temporarily retaining the UHF discount is arbitrary and capricious, when did that violation start? Well, there was a rolling deregulation that started in 2009 with the UHF discount and the FCC's extended failure to live up to its promise, but the FCC went to fix that by making the definition accurate in 2016. The arbitrary and capriciousness, if I understand your question, was April 2017 when the FCC said we're going to put it back in even though we agree it has no policy or legal justification. We're just going to put it back in while we suck our thumb for we don't know how many years. So it's having taken it up and having built a record, the only conclusion from which, in your view, is that there is no ground for the UHF discount. That is what creates the violation. That's correct, Your Honor. So if they hadn't started that rulemaking at all in 2013, and then in 2016 issued a notice of proposed rulemaking and said we're going to consider this together with the cap, there would be no... They certainly could have done that, and they could have considered them both at the same time, although there was considerable doubt as to their power to do anything with a 39% cap, and indeed it's not clear that there's a majority of the sitting commission that even agrees that it can do that. So they had very good reason not to look at both of them at the same time. Isn't there, in fact, in some circumstances, a legal obligation on an agency to institute a rulemaking in a case in which the factual circumstances have evolved such that a rule on the books is counterproductive? I don't want to go down the rabbit hole of track the FCC, Your Honor, but I think that a non-frivolous mandamus petition could have lain had one been brought about the failure to follow through on this. And there is a history of delay. The FCC, if it has one talent, Your Honor, it's delay. Fair enough. And as I've mentioned a couple cases before, there are just extraordinary examples of prolonged agency in action. Indeed, track. Understood. But we also have the December NPRM, and if I'm understanding the deadlines correctly, the deadlines for submitting comments should have closed already. So regardless of any past delay, it seems like they are moving ahead actively to consider all these issues now, and this whole thing may be overtaken by events in the relatively near future. I don't know about active, Your Honor. The comments actually were extended, and the reply comments were filed on Wednesday. The deadline was Wednesday. That's a timer on my phone in my attache case going off. I apologize to the Court. I thought it was the ice cream truck. You know what, Mr. Schwartzman, I think you can just sit down for now. We'll hear from the other side. Thank you, Your Honor. Please get the phone out of the room. It was time to take my meds. Get the phone out. It certainly is time now. Get the phone out of the room. Thank you so much. Make sure you come back, because we'll give you some time for rebuttal. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is James Carr, and I represent the Federal Communications Commission. I'd like to start with a standing issue. I think the Court is exactly right that under current law, when you're trying to establish associational standing, under the Supreme Court's decision in Summers, which has been followed by this Court, you have to identify individual members of the association. And the purpose of that is to show that those individual members have suffered a concrete and particularized injury that can be redressed by this litigation, that they would have independent standing to sue on their own. And we don't believe that these petitioners have done that to this point. What do you do with Lurandy, where we seem to say that if the plaintiff asserting viewer standing is litigating in defense of the rules that are designed to ensure diversity, the plaintiff, by definition, those are the Court's words, is injured in that context? I think Lurandy is somewhat distinguishable from this case, Your Honor, because it involved the duopoly rule, which was focused on a particular market. And so those particular individual viewers could say, we're harmed by the Commission's failure to enforce its rule in our market, that it directly affects the television we're viewing in our market. It's a little unclear to me, given the national scope of the cap, exactly what the particularized injury is here. Another thing I would note... But it does seem to give them a pass on the traceability and redressability inquiries that you might otherwise think would be live. Exactly how will the legal change impact the available programming? I think that's probably fair, Your Honor. I would also point out that subsequent to Lurandy, the two rainbow push decisions in 2003 and 2005, while they recognized that Lurandy was still good law, they were careful to say that viewer standing is not automatic. There had to be some sort of showing. And Mr. Schwartzman has tried to distinguish those cases factually here, but my larger point is that for purposes of associational standing, these petitioners haven't made the showing they need to make in order to establish their standing here. You don't dispute the breadth of their membership? I don't. You see these folks a lot. Yes, I don't have reason to dispute the breadth of their membership, Your Honor. No, I don't. But I would still say, once again, there's a purpose behind actually identifying individual members. I'm just saying the question here seems to be more one of having built the record as opposed to the factual existence of standing. Yes. Mr. Carr, can you explain the procedural regularity of the reconsideration petition here, which was not filed within 30 days of the order, which I thought was the window provided in the statute? I'm sorry, Your Honor. Do you mean the petition for reconsideration that was granted here? Yes. It actually was filed within 30 days of the Federal Register publication of the original order. And there was never any question. No party had raised a question as to the timeliness of the reconsideration petition. The clock starts to run for rulemaking proceedings. The clock for reconsideration starts to run when the original order is published in the Federal Register. So timeliness was not an issue here on reconsideration. If there are no further questions on that, I'm sorry. What's your position on whether the agency has an obligation to act when a rule that has a particular factual basis, a factual basis, has ebbed away? Does the agency have an obligation? I mean, the cases such as Bechtel and Gettler or American Horse really do suggest that there is some affirmative obligation to clean house on this. I think you're right, Your Honor. The Bechtel decision makes it clear that agencies have an obligation when facts on the ground change to take a new look at existing rules. I would point out that the situation with the UHF discount is not the only situation here where there's a question about the continuing viability of aspects of the rule, and the Commission pointed this out in the reconsideration order. The percentage level of the cap itself has not been changed in 14 years. Right. The question, I think, is, and I take it that your position hinges on the inextricability of the cap and the UHF discount. Is that right? That's right, Your Honor. A UHF, a 39% cap without a discount is much tighter than a cap with a discount. Is there, I mean, is that, if we were to disagree on that point, then do you have a fallback position? I mean, it seems to me that if one looks at the UHF discount and if one were to, and I realize this is not your position, but if one were to see it as separable from the cap, then the rulemaking that looked at its factual foundation and said it is gone would have only one conclusion, which is to get rid of it. Well, again, Your Honor, I think this is really a matter of the Commission structuring its own proceedings. This is a matter of procedural discretion. Yes, the Commission could consider, in certain circumstances, proceeding incrementally, but it also has the discretion, in proper circumstances, to decide that it's going to take a comprehensive or holistic approach, that is, reviewing the cap and the discount together, and that's precisely what the Commission is doing here. I thought it was interesting when Mr. Schwarzman appeared to concede that if the repeal order had never come out, the Commission would have been well within its rights to issue an NPRM, even a further NPRM in this proceeding, saying we're going to consider the cap and the discount together. There would have been no problem with that, and the Commission could not have been faulted for taking a procedural approach. That might be because you wouldn't have the Commission on record in the repeal order saying this thing is utterly obsolete. It has been obsolete for quite some time. No one suggests that the original jurisdiction is still valid. It impedes the objectives of the statute. I mean, the problem here is you have, and it's not contested in the reconsideration order, some pretty powerful findings about the obsolescence, not just the obsolescence, but actually the harm to the public interest that is being caused by perpetuating UHF discount in the current environment. So isn't that a pretty good reason that the ordering is different here, and it matters? There are arguments being made about the harm, but I think the reconsideration order pointed out that there were no examples given in the repeal order of any way in which the continued application of UHF discount for seven years after the digital transition took effect had had any particularized harm on competition, diversity, or localism. And the Commission's concern – Wait, wait, wait. There's plenty of findings here that it was having – the strong record is your record – that it was allowing folks to effectively have up to a 78% national reach. Isn't that important? Well, it depends, Your Honor. It depends on whether the cap itself – and this was the Commission's point in the reconsideration order. What the repeal order did was it eliminated the discount, but it made no findings with respect to whether the cap itself was still set at the proper level. And that amounted to a tightening of the cap without any particular finding. It did not tighten the cap. It kept it at Congress's 39%. The problem had been that with the transition to digital and the sudden preference for UHF standards that, in fact, people could blow right by it and were doing it by buying up more UHF channels. So the 39% thing was becoming, you know, like a speed limit in D.C. People wave as they go by. It tightened the effect of the cap because, as we've explained – It did not tighten the cap. It said the cap's real. It did not tighten the level of the cap, but it tightened the way – It made it real. I'm sorry, Your Honor? It made it – It made it real. It made it effective. That's how I read the repeal order. That still leaves the question, is a 39% cap itself in the public interest? After 14 years – And the FCC is certainly free to look at that. But my question is, you look at it. You go through this rule of making. What are your options for dealing with the UHF discount once you've figured out whatever you think, whether you think you can change it and then whatever you think that number should be, once you've crossed those bridges? Any world in which the UHF discount will be kept, given the uncontested, unchallenged findings in the 2006 repeal order? Well, Your Honor, questions are being asked in the ongoing rulemaking about whether there are rationales for keeping some sort of UHF discount. It may be unrelated to technical justifications. Are those questions different than the ones that were raised in the repeal order? No. And so I'm just – and I want to make that clear. No. Okay, so given the reconsideration order doesn't undo those findings. No. And so its decision to keep the UHF order in place has got to be on a rationale that's consistent with those findings. It could, at the end of the day, it could always revisit anything. But its decision to keep the UHF discount in place, normally that would come if there's some assumption we would keep it at the end. But those concerns, the only arguments now being raised are ones that are already rejected. So it doesn't seem that there's any option for keeping it in its current form that seems at least plausible at this stage. And if you're just going to throw it away at the end when you've got a new number, then what is the point of carrying this UHF discount forward, this sort of moribund body? You're going to keep it on life support going forward if there's no prospect of it being reinstated at the end. It's just buying more time. Let me return to what the reconsideration said about the repeal order. Among other things, it said that the commission thought the early order was arbitrary and capricious, and that was in part based on Judge Ambrose's decision in Prometheus III where the Third Circuit found that the commission had made an attempt to modify the calculation of an ownership restriction, saying it was closing a loophole, much as it said it was doing in the UHF discount context. But it hadn't considered whether the overall ownership restrictions were still in the public interest. And Judge Ambrose put it, it might not be in the public interest to close loopholes to rules that should no longer exist. The idea is that before you make a change in methodology, you have to take a look at the ultimate goal, which is establishing an ownership restriction that serves certain public interest purposes. If the 39% cap itself is no longer in the public interest, if it's too tight based on marketplace considerations, and the commission suggested in the reconsideration order that there have been marketplace developments that suggest the cap should be loosened, then going ahead and eliminating the discount and doing nothing further is effectively creating a situation where you could be blocking transactions that would otherwise serve the public. That would only be true if there were any plausible basis on the record, which I haven't seen, to say that the UHF discount is actually serving the salutary purpose of adjusting that cap, and that's what it's been doing, and it's adjusting it just enough at the margins to allow the changes that would be appropriate under a new cap. I assume the commission isn't going to adopt a 78% new cap. I know you can't quit closing, but I'm going to make that radical assumption that they're not going to do that, okay? And there's no argument, no rationale in either the reconsideration order or the repeal order that suggests that what the UHF discount was doing was just inching up the national cap to deal with the problems of keeping an not-recently-updated national cap in place. So again, I'm back to I don't understand what the point of keeping this, what this record tells us is a rational reason for keeping this thing alive when everyone has said it's obsolete, it's harmful, there's no point to it, it's way outdated, it needs to be gone, it's leading to people grossly, grossly oversweet in the national cap. It's going to be gone at the end, so why keep it alive now? The rational reason is that as a result of elimination of the discount, without any adjustment to the 39% cap, you have a much more restrictive ownership restriction placed on parties. So, for example, let's say, for example, that a station owner wants to buy another station in the market, and this is a station owner who has great programming, great news and public affairs programming, the new market would benefit from the new station, but that particular station owner is up against what is now the 39% cap without the discount. It turns out that the 39% cap is actually much too tight, that, as has been suggested by the marketplace evidence, the cap should be higher. Let's say it should be 50%. And this transaction would fall within that cap. What that means is that a particular transaction that would benefit the public is being blocked. Well, that's just a reason for the FCC to go fast on reviewing the national cap. Anytime you have a cap in place, you're going to have it. Someone's going to be really, really good, and they're just going to bump up against it. That's what happens any time any line is drawn. But the FCC has been perfectly content until 2017 to leave the national cap as it was. So that's on the FCC. But that still doesn't justify saying, well, we've gotten rid of this thing that has no salutary purpose, allows people to grossly overshoot the cap in a way that no one is arguing is consistent with the public interest. It is not in the public interest. They're finding that it is not in the public interest to have that UHF cap there functioning. And so saying we're going to keep this thing, that there's no technical reason for it, no policy reason for it, just because we want to be able to allow someone at the margins to do something good doesn't seem like a very rational way to approach the problem. Your Honor, I think you have to look at it in the broader picture. The rule itself has various components. The ultimate purpose of the rule is to... Which rule are you talking about? I'm talking about the national audience reach cap rule. It has various components. It's got a UHF discount. It's got a percentage level of the cap. All of those components are designed to work together. That's just the math. That's just the math formula for deciding whether you've met the cap. It's not a multi-factor balancing of interests. It's just how we decide whether you're there or not. I understand all of that, Your Honor. But all of those components are designed to work together. Their ultimate purpose is to achieve a... All of those, the UHF is meant to calculate. The ultimate purpose of the rule is to achieve a restriction that's going to serve certain public interest objectives. And the Commission's view on reconsideration was that the Commission in the repeal order simply hadn't found that the cap, as currently constituted as modified by eliminating the discount, was serving the public interest. Because we had no idea, given the Commission's statement in the repeal order, that it wasn't even considering a reexamination of the cap. Didn't Congress say 39% is in the public interest when it put there, unless and until the FCC finds that 39% is not in the public interest? It said it directed the Commission to amend its rules to... Place. That's right. That we assume that Congress doesn't see the public interest, so it's in the public interest. And it gave the Commission the ability going forward, if circumstances changed, to adjust the cap. That's right. Under the Bechtel rationale, just as technological changes might have justified eliminating the discount, marketplace changes may well justify adjusting the cap. And that's the Commission's point. It didn't make sense to go forward with one major change without taking a broader look at the rule in general and considering the discount and the cap together. What is the current justification for the UHF discount right now? The justification that the Commission said was that it wanted to take a look at the rule as a whole before. So it doesn't really have that. So return to the status quo. I'm sorry. I'm sorry, Your Honor. Go ahead. I'm sorry. No, I was just going to say, just as a sort of formal matter, it doesn't have a justification now, but the Commission anticipates that as a result of a package reconsideration in the pending rulemaking, it may obtain one. Is that right? Yes. I mean, another way of thinking about this is, let's say the repeal order had been challenged in this court. There had been no reconsideration order. And let's say the court agreed with the broadcasters challenging that order, that the Commission had failed to consider an important aspect of the problem. It had failed to consider the impact of changing the discount on the effect of the cap. So it remanded the matter and it vacated the earlier order. That would mean that we'd be back to the same place we were before the 2013 rulemaking. You would have the same. But you're assuming a vacature of the order, which doesn't always happen when we find information explanations. It doesn't always happen. That's a fair point, Your Honor. But it often happens. And certainly if Judge Randolph is on the panel, it will happen. But in any event, if there is vacature, you're back to the same place where we are now, the rule enforced with the discount. And that's basically the Commission's point in the reconsideration order. It wanted to start from scratch because it believed that it was a flawed process, as a matter of policy and a matter of law, to proceed with one major change without considering another important aspect of the problem. And the matter of law is that changing a method of calculating compliance with the cap, in your view, is inextricably linked with the level at which the cap is set. I think it is for some of the reasons that Judge Ambrose gave in his Prometheus III opinion. And the 1999 order modifying the compliance with the ownership cap, in that case the FCC said it didn't have to consider the cap in that situation. I think, again, there are factual distinctions there. The methodological changes that were being made there were minor. They didn't result in anybody exceeding the cap. Obviously in this case, there was a major change. And the Commission in the repeal order recognized it was a major change, which is why it grandfathered existing arrangements. But doesn't the grandfathering answer, that makes it analogous, the 1999 order, because it's basically saying we're going to deal with the transition costs in that way. It doesn't entirely make it analogous, Your Honor, because of the hypothetical I was giving earlier about broadcasters who may want during this time to make a transaction, to complete a transaction that would serve the public, but they're blocked because the cap is tighter than it should be. I just want to make sure I understand part of your answer to Judge Pillard. If I heard you correctly, you said that while there may not currently be a justification for a UHF discount, there may be one in the future as you consider things more holistically. One of the things, if you look at the NPRM that came out in December, the Commission is asking questions about what it should do with the UHF discount. It has asked for the possibility that there may be, and some have argued that there are alternative rationales for keeping a UHF discount. I don't know what the Commission is going to do on that, but that's a possibility going forward. As I mentioned to Judge Millett, that really doesn't have anything to do with what we've done to this point. Right, because I thought where we are now is you've taken the position that the cap and the discount are related, and that makes a lot of sense to me, and you therefore have a concern that when you get rid of the discount, one incidental effect will be to tighten the cap or the effect of the cap or however you want to describe it, and you have some awfully good reasons for thinking you might want to raise the cap, but the only concern about the discount is that eliminating it might tend to toughen the cap. Yes, that's right. So you have reasons for thinking you might want to raise the cap, but you don't really have any reason for thinking that at the end of the day, part of the solution will be the UHF discount. Part of the solution will be eliminating that? Will be keeping the discount. Keeping the discount. Right. I think that's probably fair, Your Honor. It's not entirely clear. So what's the justification of having taken it off the books? You are affirmatively reinserting into the Code of Federal Regulations something that on its own terms doesn't make sense, just because you're worried about collateral consequences that you're addressing in other parts of the proceeding. Well, I guess I would not describe them as collateral consequences. I think they're direct consequences, and this goes back to the Commission's thinking about treating these in tandem. You change the discount. You have no justification for distinguishing UHF and VHF, and you're just worried that the 78% is becoming 39% or something like that. Right. And the Commission never found in the repeal order that that sort of effective tightening of the restriction was in the public interest. And until there is a finding to that effect, the Commission felt rather than make this major change in the rule, it ought to consider all elements of the rule together, consider the discount and the cap in tandem. I only have one question. I know we've kept you long. If I were a VHF owner, wouldn't I have an equal protection challenge? Because there's no basis. There are broadcasters in the audience, John. You're giving them ideas. You're talking about interests in a more permissive cap. Yes. And I think this just follows up on Judge Katz's argument, why this is a vehicle, especially given that it really seems like a mismatch with the interest or the potential interest that the Commission is exploring. In other words, the potential interest being the cap should be looser. Because the UHF discount only applies to a subset of stations and not everybody owns those stations but might have the same kind of public interest programming to offer, there's an arbitrariness in that aspect of the drawing of the line between these two types of stations that I haven't really heard you address at all. I take your point, Your Honor. And there actually is some discussion, and there was some discussion I think in the repeal order, about whether to actually have a VHF discount. I think there's still some discussion about that. A fortiori, it's a difficulty. Yes. It is something of a difficulty. Again, I think the Commission's view was before it made any change to this rule, it really ought to consider all of the elements of the rule together. And that's just a matter of structuring its proceedings. That's a matter of procedural discretion. And that was entirely reasonable. Can I just ask what's going on in the rulemaking? Yes, Your Honor. There have been concerns raised about delay, but the deadlines have passed. I mean, what we're addressing here has a real possibility of being overtaken by events. So, I mean, what's your expected timeline for doing this holistic reconsideration that you're talking about? I'm reluctant to give any firm timeline. All I can tell you is the Commission has issued the NPRM and the pleading cycle has closed. Earlier this week, the deadline for filing reply comments passed. And so the Commission has, and the Chairman is on record as saying that he's committed to making this. Can you give me any sense? I mean, let's say we take six months to write an opinion on average. Can you give me any sense of whether, you know, in month five, week three, we'll get something dropped on us? I'm uncomfortable about making any representations given, as Mr. Schwartzman said, the Commission's fine reputation for acting promptly. As one of the Commission's lawyers, I'd love it if the Commission acted more promptly than it does in most instances. Can I just ask one other question? That was an attempt to help. Thank you, Your Honor. I appreciate it. I assume, I'm not sure things would be overtaken if, in fact, the reconsideration, if part of a new rule would be to extend the grandfather clause, the grandfather treatment. I mean, is it a theory that by keeping this in here, you're going to have a longer grandfather period than you would have had without the reconsideration order? Isn't that right? Well, grandfathering would certainly be an issue in the next order. I think that's right, Your Honor. And I'm not in any position to know exactly what might happen. I will say, to the extent, if there are any applications for acquisitions during this period that are granted, and if the Commission adopts a cap and those acquisitions are out of alignment with the new cap, the Commission certainly has authority to require unwinding of the transactions through divestiture. Well, no one likes to do that, so maybe what the Commission would do is just not authorize anything while it's going through this process. That might make it speed things up, too. That certainly would be a possibility as well, but I'm not in a position to say exactly what the Commission will do at this point. Okay. Thank you. Thank you, Your Honors. All right, Mr. Schwartzman, we went over your time, but we will give you two minutes. Thank you, Your Honor. First, I have received a forceful tutorial from the Marshal that you have to push the button twice to power off a phone, and I deeply apologize to the Court. Two things I'd like to say. First of all, with respect to the Prometheus III authority that Mr. Carr cited, that was a case in which the FCC was under a statutory mandate to consider all of its rules, and what it did was consider some of its rules and punt on the others. And the Court was saying, no, you have a statutory mandate to look at all of them, and that's very distinguishable from the scenario here. With respect to standing, Your Honor, we would like permission of the Court to submit supplemental declaration, but I would say this. As long as the law of this Court is that petitioners as a group of citizens interested in diverse programming have standing to bring this, I think that the nature of the injury being asserted here, which is concrete, is nonetheless difficult for any one listener to submit a declaration saying, I am harmed because this particular company has bought three more stations in another market, which is going to affect my localism. That injury is cognizant of injury in this Court. I don't think that subsequent law in this circuit makes it necessary for that level of particularity in the particular circumstances of listeners' standing. Well, you might be advised to include Supreme Court precedent as part of the law of this circuit if we were to permit subsequent filings. Yes, Your Honor. Thank you, Your Honor. Thank you. The case is submitted.
judges: Millett, Pillard, Katsas